UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LEONARD R. THOMPSON, ET AL    *         CIVIL ACTION

VERSUS                       *         NO: 03-0172

NISSAN NORTH AMERICA, INC.,    *         SECTION: "D"(5)
ET AL

## ORDER AND REASONS

Before the court is the **"Motion for Summary Judgment"** filed by Defendants, Nissan Motor Company, Ltd. and Nissan North America, Inc. (Nissan), seeking dismissal of Plaintiffs' claims that the design of the fuel system on the subject 1993 Nissan Pathfinder was defective. Plaintiffs (Leonard R. Thompson, Clarissa Thompson McGowan, Homer Thompson, Willie C. Thompson, Jr., Augustine Thompson Anderson, Annie Pearl Thompson, Deck Zell Thompson, Mary Thompson Greely, Lorandy Thompson, Chandra Thompson Weary, Michael Thompson, Lesley Thompson, Ava Head, individually and on behalf of the estate of her minor child, Jerald Head) oppose the motion.

The motion was set for hearing on Wednesday, March 15, 2006, on which date the court heard oral argument from counsel.  Now, having considered the memoranda and argument of counsel, the record, and the applicable law, the court finds that there are no genuine

issues of material fact, and Nissan is entitled to judgment as a matter of law.

## I.  Background

On January 20, 2002, Mrs. Betty Thompson Segura was driving a 1993 four-door Nissan Pathfinder with five passengers.  Due to an apparent rapid deflation of the left rear tire, Mrs. Segura lost control of the vehicle.  The vehicle flipped and landed on its roof.  A large amount of fuel spilled from the vehicle, causing the vehicle to be immediately engulfed in flames.  Mrs. Segura and three of the passengers perished.  The other two passengers survived, but one of them, Leonard Thompson, sustained severe burns.

In his deposition, Leonard Thompson testified that he was the last person to fill the vehicle with gas prior to the accident and that he had "closed the thing back up." (Thompson Dep. at 58).  In a subsequent Affidavit, Mr. Thompson clarified "that what he meant by 'closing the thing back up,' was that I screwed the gas cap back on the vehicle, until it was secure, and then shut the filler door." ( *See* Thompson Affidavit attached as Exhibit A-1 to Plaintiffs' Opp.).

However, there is no evidence that a fuel cap was on the vehicle at the time of the accident.  A fireman who reported to the scene of the accident recalled that the fuel filler door was closed, and when it was opened, there was no fuel cap in place and

there were no remnants of a cap. (Eiseman Dep. at 15).   [1]

---

[1]      Firefighter Eiseman along with Captain McCloskey and Firefighter
Tournier were the first fire department personnel on the accident scene.
(Eiseman Dep. at 8-9).  Firefighter Eiseman testified:

> Q.    From the time that the fire was put out until
>       the time that you opened the fuel door, had
>       anyone else gone to that fuel door that you know
>       of?
>
> A.    Not to my knowledge.
>
> Q.    Is it fair to say that you three fireman
>       essentially were the people at that vehicle from
>       the time that the fire was put out until the
>       time that the fuel door was opened?
>
> A.    From the time we arrived on the scene till-I'd
>       feel safe saying it-you know, I can't guarantee
>       that someone didn't go, you know, but I feel
>       safe saying it, no one else was there.
>
> Q.    And if Captain McCloskey earlier indicated that
>       the fire personnel never left the vehicle after
>       the fire until that door was open, would that be
>       your recollection as well?
>
> A.    Right.  That would be true.
>
> Q.    When you opened the door-before you opened the
>       door, was it completely shut?
>
> A.    Completely shut.
>
> Q.    When you opened it, what did you observe?  What
>       did you see?
>
> A.    Just a spout, no cap, no gas cap.
>
> Q.    Did you see, you know, burned or melted remnants
>       of a gas cap?
>
> A.    It's hard to say.  I didn't look into it deep,
>       but I didn't see a gas cap.
>
> Q.    Ans as you sit here today, you don't have a
>       recollection of seeing pieces or burned
>       remnants?
>
> A.    I looked in there and - I mean I'm, you know,
>       not a forensic guy or nothing, but I seen no
>       sign of it.

3

Even Plaintiffs' design expert, Jerry Wallingford, testified that neither the fuel cap nor remnants of the cap were found inside the metal filler neck housing, and he concedes, that in his opinion, it was more probable that the cap was not installed. (Wallingford Dep. at 97, 119 & 122).

In this suit, Plaintiffs sue Nissan under the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 *et. seq.*, claiming that the fuel system of the subject 1993 Pathfinder is defective in design, because when the vehicle is upside down and the fuel cap is either missing or improperly tightened, fuel is allowed to escape

---

Q.   Okay.  Did you see any metal pieces from the gas cap that were laying in or around the spout?

A.   No, sir.

Q.   ... Did you then communicate to the other firefighters to take a look or to see what you saw?

A.   I can't remember exactly who it was, I'm wanting to say it was Inspector Keith Estes that I said come see, if I'm not mistaken.  I mean I could be wrong.  I know I grabbed one of them and said come see and observed the same thing.

Q.   Were you specifically pointing out the lack of a gas cap when you said come see?

A.   Yes, sir.

Q.   To you was that something that was unusual and you just wanted to get other people's input on it?

. . .

A.   Yeah, basically I wanted someone else to see it.

(Eiseman Dep. at 14-16).

in large amounts from the fuel tank through the filler tube and filler vent line. Plaintiffs maintain that a **safer alternative design** exists because both the filler tube and the filler vent line could have been equipped with anti-spill devices, which would have prevented the leakage of fuel in the event the vehicle overturned with a missing or improperly tightened fuel filler cap.

In its Motion for Summary Judgment, Nissan submits that the design of the 1993 Pathfinder fuel system was safe and that the fuel filler cap, if properly used, would prevent the leakage of fuel (from both the filler tube and the filler vent line) if the vehicle overturned.[2]  Nissan further argues that Plaintiffs have proposed two alternative designs for the 1993 Pathfinder fuel system, but that neither of these two alternatives meets the criteria of an alternative design under the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 *et seq.*

---

[2]     Plaintiffs do not contest Nissan's Statement of Uncontested Facts Nos. 14 & 15 which state:

> 14.   The subject 1993 Pathfinder complied with Federal Motor Vehicle Safety Standard [FMVSS] 301, the governmental standard which sets crash criteria for automobile fuel systems during crash testing to include rollover.

> 15.   FMVSS 301 does not require the testing of automobiles in a crash environment, to include rollover, without their filler caps in place.

Plaintiffs' design expert, Jerry Wallingford, also testified that he was unaware of any criteria in FMVSS 301 in the late 80's/early 90's time frame) that required that the 1993 Pathfinder be tested for certification with the filler cap out of position or missing entirely.  (Wallingford Dep. at 133).  Further, he was <u>unaware</u> of any manufacturers in that time frame who were testing with no filler cap in place or one that was partially loosened. (*Id*).

## II.  Legal Analysis

### A.  Plaintiffs' Defective Design Claims

Section 2800.54 of the Louisiana Products Liability Act (LPLA)
provides:

**§2800.54.  Manufacturer responsibility and burden of proof**

A.  The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

B.  A product is unreasonably dangerous if and only if:

(1)  The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2)  **The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;**

(3)  The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4)  The product is unreasonably because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

C.  The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer.  **The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56** or 9:2800.57 **must exist at the time the product left the control of the its manufacturer or result from a reasonably anticipated alteration or modification of the product.**

6

D.   The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

LSA-R.S. 9:2800.54 (emphasis added).

Section 2800.56 of the LPLA provides:

**§2800.56.   Unreasonably dangerous in design**

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

(1)   There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2)   The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.  An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

LSA-R.S. 9:2800.56.

When making a claim that a product is unreasonably dangerous in design, the Plaintiff bears the burden of proving both of these elements.  LPLA, 9:2800.54(D); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 181 (5th Cir. 1990), *criticized on other grounds, Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 & n. 14 (5th Cir. 1994).

In its Motion for Summary Judgment, Nissan argues that it is entitled to summary judgment because:

(1)   Plaintiffs have failed to prove that using the Pathfinder *without a filler cap* is a "reasonably

7

anticipated use" of the product;

(2)   Plaintiffs have only shown a "conceptual" design change, and thus have failed to satisfy the criteria of an "existing" alternative design within the meaning of the LPLA; and

(3)   Plaintiffs have failed to perform risk/utility testing of their proposed alternative designs.

The court discusses each of these arguments next.

**(1)   _Have Plaintiffs presented sufficient evidence to enable a reasonable trier of fact to conclude that Plaintiffs have established that their use of the subject Pathfinder either without a filler cap or an insufficiently tightened filler cap was a "reasonably anticipated use" of the product?   "Yes"_**

The LPLA defines "reasonably anticipated use" as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances."   LPLA, 9:2800.53(7).[3]   "The standard for determining a reasonably anticipated use, therefore, is objective (an ordinary person in the same or similar circumstances) and, ... what constitutes a reasonably anticipated use is to be ascertained from the point of view of the manufacturer at the time of

---

[3]     There is nothing in the language of LPLA, 9:2800.53(7) to suggest that a "reasonably anticipated use" may not include an "unreasonable use."

8

manufacture."    Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La.L. Rev. 565 (1989).

Nissan argues because Plaintiffs either failed to use the filler cap or improperly tightened it, their "non-use" or misuse of the filler cap was not a "reasonably anticipated use" especially when: (1) the fuel filler lid included a holder for placement of the cap when the user is pumping gasoline; and (2) the 1993 Nissan Pathfinder Owner's Manual provided written and pictorial instructions regarding the operation of the fuel filler cap. However, the court concludes, under the circumstances presented here, the issue of *whether or not Nissan should have been aware that users of the subject Pathfinder would inadvertently either not use the filler cap or improperly tighten it* is a question of material fact.

However, to survive Nissan's motion for summary judgment, Plaintiffs are still required to present evidence sufficient to enable a reasonable trier of fact to conclude that they have established other essential elements of their claim, including that a safer alternative design was in existence at the time the vehicle left Nissan's control and that the risk avoided by such a design outweighed the burden of adopting the design. *Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 590 (5th Cir. 1994), *citing Lavespere v. Niagara Mach & Tool Works, Inc.*, 910 F.2d 167, 181 & 183 (5th Cir. 1990).

<u>**(2) *Have Plaintiffs presented sufficient evidence to enable a reasonable trier of fact to conclude that Plaintiffs have established that a safer fuel system design existed at the time the 1993 Pathfinder left Nissan's control?  "No"***</u>

The original design of the 1993 Pathfinder fuel system incorporated (*in addition to the fuel filler cap*):

(1)    a **filler tube/neck** of approximately 3 inches in diameter entering the tank;[4]

(2)    a **filler vent line** of approximately .5 inch in diameter that exits the tank, runs alongside the filler tube and vents to the atmosphere;[5] and

(3)    an **evaporative vent line (or tank vent line)** of approximately 60 microns[6] in diameter that runs from the top of the tank to a canister and it is

---

[4]    Gasoline is put into the tank via the filler tube.  The location where the filler tube meets the fuel tank is called the filler tube spud.

[5]    In this opinion, the terms "fill vent line" and "filler vent line" are sometimes used interchangeably.

The fill vent line (or filler vent line) runs from the tank back upstream  to where the fill cap is attached so that during the filling process, the pressure in the tank is equalized. The fill vent is tuned in such a way that it determines when and how the nozzle shuts off while the tank is being filled.  (Noble Dep. at 34).  The fill vent line has a larger diameter than the evaporative line (discussed in fn. 6, *infra* and accompanying text) because the equalization of pressure is driven faster when filling the tank.

[6]    One (1) micron = 1 x $10^{-6}$ meters or .00003937 inches.  Sixty (60) microns = .0023622 inches.  For reference, human hair is roughly fifty (50) microns.  *See* The MSDS HyperGlossary: Distance Unit Conversions.

10

equipped with a Nissan rollover valve.[7]

Plaintiffs claim that this fuel system was defective because neither the filler tube nor the filler vent line (unlike the evaporative vent line that was equipped with a rollover valve), was equipped with any type of "anti-spill device," and thus if the vehicle was overturned (*without a filler cap or an improperly tightened filler cap*), fuel would escape through both the filler tube and fill vent line. (*See* Deposition testimony of Plaintiffs' expert, Jerry G. Wallingford, P.E., at p. 81, lines 8-17).[8]

Plaintiffs' proposed **Alternative Design 1** incorporated an Aero Tech racing check valve in the original filler neck area. Plaintiffs' proposed **Alternative Design 2** incorporated both: (a) a GT Products Shut-Off Valve (for testing purposes, removed from a 1999 Chevrolet Malibu) to minimize fuel leakage from the filler

---

[7]     In this opinion, the terms "evaporative vent line" and "tank vent line" are sometimes used interchangeably.

        The evaporative vent line (or tank vent line) vents the tank during normal operation of the vehicle, driving down the road, up and down hills or mountains, or when the vehicle is subjected to changes in temperature. (Noble Dep. at 33). The diameter of the evaporative vent line is 60 microns, and if the vehicle is inverted, the rollover valve will seal the evaporative vent line.

        There is no question that *if* the type of Nissan rollover valve used on the evaporative vent line would be used on the filler vent line, the rollover valve would have to be modified (e.g., made larger) because the filler vent line (approximately ½ inch in diameter) is substantially larger than the evaporative vent line (approximately 60 microns in diameter).

[8]     Jerry G. Wallingford was Plaintiffs' expert who opined that the existing fuel system on the 1994 Pathfinder was defective. Unlike Plaintiffs' expert, Thomas Green, Mr. Wallingford neither proposed alternative designs nor did any testing of alternative designs, but Wallingford gave opinions that the alternative designs (proposed and tested by Plaintiffs' other expert, Thomas Green) were safer than the existing design on the subject vehicle.

11

tube; and (2) a Nissan rollover valve (like the one already installed on the evaporative vent line) to minimize fuel leakage from the filler vent line. ( *See* Deposition testimony of Plaintiffs' expert, Thomas Green, at pp. 68-69, referring to the two alternatives as "modification one" and "modification two").[9]

As the court next discusses, Plaintiffs have failed to offer sufficient evidence to show that these alternative designs "existed" within the meaning of the LPLA, at the time the 1993 Pathfinder left Nissan's control.

**(a)  Plaintiffs' Alternative Design 1 using an Aero Tech racing car valve**

The Aero Tech racing valve[10] was allegedly in production during the 1990-93 time frame and was used selectively for some race cars, but there is no evidence that racing valves were used on any production level passenger vehicles during this time.  Further, Plaintiff's design expert, Thomas Green, testified that to implement this design into any *production vehicle* like the 1993 Nissan Pathfinder, the racing valve would have to be mounted on top of the tank <u>and</u> have a vent line with an appropriate rollover valve

---

[9]     Thomas Green was Plaintiffs' expert who proposed and tested alternative designs.  Unlike Plaintiffs' expert, Jerry Wallingford, Mr. Green was not asked to give any opinions as to whether the existing fuel system of the 1993 Pathfinder was defective.  (Green Dep. at 22, 43, 71).  Green also deferred to Wallingford on the issue of whether or not his alternative designs would have been successful at reducing leakage sufficiently to prevent the type of fire encountered in the subject accident.  (Green Affidavit, Plaintiffs' Exhibit G at p. 5).

[10]     *See* Plaintiff's Exhibit H.

installed in the tank so that the tank could be filled to capacity. (Green Dep. at 118, 159).  However, Green never attempted to design or test such a configuration on a 1993 Pathfinder.

Instead, Green actually removed the tank from a 1993 Pathfinder to mount the racing valve and then test the modified tank.  Green explained that in mounting the racing valve, he had to mount the racing valve very low on the side of the tank because of the way the tank was designed.  (Green Dep. at 109).  Further, he had to cut off both the extension coming off the tank to which the filler neck hose was attached <u>and</u> the filler vent tube which was adjacent to the filler tube.  (Green Dep. at 95).

When Green mounted the racing valve over the hole for the filler tube, the racing valve was so large it obscured the vent line hole.  (*Id.* at 97).  In essence, Green obliterated the filler vent tube on his model, but he confirmed for use on a production vehicle such a vent tube would be needed.  (Green Dep. at 116).

Green put his configuration on a rotating fixture to test whether or not the racing valve would prevent leakage out of the filler neck opening, and he described his testing as follows:

> Ten (10) gallons of stoddard solvent[11] were added to the fuel tank.  The shipping plug was placed back into the fuel spud on the tank.

---

[11]   For testing purposes, Green used stoddard solvent which has physical properties and characteristics similar to gasoline.  (Green Dep. at 44-45).  It is undisputed that stoddard solvent is the fluid required by the government during crash testing of vehicles to ensure the integrity of their fuel systems. Further, while not being as flammable as gasoline, it has essential similarities to make it predictive of gasoline leaks.

> No filler neck was installed on this tank.
> The fixture was rotated to 180 degrees roll
> and 0 degree pitch.  The testing revealed
> during the first few minutes that only a few
> drops leaked from the tank.

(*See* p. 3 of Green Affidavit, attached to Plaintiffs' Opp. as Exhibit G).

Green explained that he did not fill the tank to its 21 gallon capacity because his configuration would not allow that. (Green Dep. at 109).  Further, because Green did not assemble the racing valve into a full production vehicle, Green did not know if Federal Motor Vehicle Safety Standards would be met.  (Green Dep. at 160).

Green also did not have the specs for the particular racing valve that he used in his testing.  (Green Dep. at 92).  And while he could not recall if the racing valve as originally purchased had any literature addressing how it was to be used, he admitted that it is intended to be mounted mainly on fuel cells that are used in race vehicles.[12]  (*Id.* at 93).

The court concludes that Plaintiffs cannot survive summary judgment on Green's Alternative Design 1 using an Aero Tech racing car valve. **Indeed, at oral argument, Plaintiffs' counsel conceded that Plaintiffs were not offering the alternative design using the racing car valve as a safer alternative design, but for the more general purpose of showing that in 1970 there was some type of**

---

[12]    Fuel cells are reinforced fuel tanks that are generally made of a much thicker material than a standard fuel tank.  (Green Dep. at 94).

**flapper valve (i.e., the racing valve) that addresses the risk of fuel leakage.** (Transcript of Oral Argument on Nissan's Motion for Summary Judgment, at pp. 39-40). Plaintiffs' counsel maintained at oral argument that "for the purposes of preventing fuel leakage in this accident on this vehicle we have a design [i.e., Alternative Design 2] that works already." (*Id*. at p. 41).

**(b)   Plaintiffs' Alternative Design 2 using a GT Products Shutoff Valve/Nissan Rollover Valve Combination**

As the court has previously noted, while Plaintiffs retained experts, Thomas Green and Jerry Wallingford, in an attempt to prove their case, Plaintiffs retained these two experts for different purposes.[13] Plaintiffs retained Thomas Green to propose and test alternative fuel system designs, but he was <u>not</u> retained to render an opinion regarding whether or not the existing fuel system was defective or to render an opinion regarding whether or not his alternative designs, including the GT Products/Nissan rollover valve combination, would have been successful at reducing fuel leakage sufficiently to prevent the type of fire encountered in the subject accident.[14] On the other hand, Plaintiffs retained Jerry Wallingford <u>not</u> for the proposal or testing of Green's alternative fuel system designs, but to render an opinion regarding whether or not the existing fuel system was defective and whether or not

---

[13]   *See* footnotes 8 & 9, *supra.*

[14]   *Id.*

15

Green's alternative designs were safer.[15]

For Alternative Design 2, Plaintiffs' expert Green equipped
(1) the filler tube with a GT Products Shutoff Valve[16] and (2) the
filler vent line with a Nissan rollover valve.  However, like the
racing car valve alternative, Green did not configure or test the
GT products Shutoff Valve/Nissan rollover valve alternative design
in a full vehicle type setup.

Rather, Green made a test apparatus of an exemplar fuel tank,
filler tube and fill vent line by: (1) removing a GT Products
Shutoff Valve which was installed inside the filler spud[17] of a 1999
Malibu and attaching this assembly to a 1993 Nissan Pathfinder fuel
tank;[18] and (2) attaching a Nissan rollover valve (the type of which
was already used on the evaporative vent line) to the filler vent
line.[19]  It is undisputed that when Green tested his modified tank

_____

[15]    *Id.*

[16]    *See* Plaintiffs' Exhibit F, patent for the GT Products Shutoff
Valve, dated January 7, 1997.

[17]    As previously noted in fn. 4, the filler spud is the location
where the filler tube meets the fuel tank.

[18]    Green explained that when he inserted the GT Products Shutoff
Valve from a 1999 Malibu, that required "a little bit more work than the
racing valve."  In the Malibu, the valve is an integral part with the filler
neck spud which extends down into the tank.  To make his alternative design,
Green had to cut out a portion of the Malibu tank, remove the stock filler
neck from the Pathfinder and then braze the Malibu filler neck spud (with the
attached portion of the Malibu tank) to the Pathfinder tank. (Green Dep. at
120-21).

[19]    Again, the diameter of the evaporative line was approximately 60
microns, while the diameter of the fill vent line was approximately .5 inch.
When asked if he had to make changes in the fill vent line to accommodate the

on a rotating fixture and simulated the rest position of the subject vehicle, leakage of the test fluid was less than what is allowed by Federal Motor Vehicle Safety Standard (FMVSS) 301.

However, as the court next discusses, Plaintiffs have offered insufficient evidence to show that Alternative Design 2 (i.e., combination GT Product Shutoff Valve/Nissan rollover valve) "existed" within the meaning of the LPLA, at the time the 1993 Pathfinder left Nissan's control.   The court will first discuss the rollover valve proposed for the filler vent line, then the GT Products Shut-off Valve proposed for the filler tube/neck.

> **(1) At the time the 1993 Pathfinder left Nissan's control, the Nissan rollover valve did not exist as an anti-spill device for use on the filler vent line.**

On the 1993 Pathfinder, the evaporative vent line (or tank vent line) had a Nissan rollover valve that was patented in 1988. (*See* Plaintiffs' Exhibit E). Plaintiffs point out that Nissan's corporate representative, Michiaki Sasaki, agreed that the Nissan rollover valve for the tank vent line is a simple valve which works with a ball activating a sealing member that closes the system. (Sasaki Dep. at 42-44). Thus, Plaintiffs further argue that "[i]n terms of feasibility, the Nissan rollover valve (Exhibit E), which

---

rollover valve from the smaller evaporative line, Green explained that he had "to step down the diameter of the tubing at attach the valve." (Green Dep. at 119).

was present on the subject vehicle's evaporative [vent] line and has proven to work on the fuel filler vent line, was obviously feasible at the time the subject vehicle was manufactured." (Plaintiffs' Opp. at 12).

But Plaintiffs' expert Wallingford admitted that the Nissan rollover valve as it was manufactured and existed for use on the evaporative line could not be placed (without modification) on the filler vent line, "but a device with that **concept** modified for [that] application could be." (Wallingford Dep. at 82-83, emphasis added).

Wallingford further testified:

Q.   Turning first to the utilization of the valve from the vapor recovery system [i.e., the evaporative line], have you made a determination of how that valve would have to be resized so as to use it within the vent tube?

A.   Well, A, the vent tube is a larger diameter tube, certainly I have to pass a larger volume of vapor or gas air out of the system in order for it to function properly.  Therefore, **the valve itself may have had to be sized much larger** but work in the same fashion, that being the spring-fed fashion so that it can allow the passage of vapor but not the passage of liquid.

Q.   Why is it significant that the valve be allowed to pass vapor?

A.   Because that's how I allow fuel into the tank is by release of vapor from the fuel tank.  The liquid end must displace vapor.  Otherwise, I can't get in.

(*Id.*, emphasis added).

18

As reflected in the following testimony, Wallingford admitted there was also no developmental testing of the type of rollover valve that would be used in the filler vent line:

> Q.  And as you envision this valve re-sized, it would be able to allow the passage of vapor during filling, but not allow the passage of vapor during the incident of an inversion?
>
> A.  Well, not allowing the loss of primarily liquid.  I don't know how effective it would be to vapor loss, but the amount of vapor that would be released from a non-fill event would be very small.  **That's the sorts of things that you must sort out in developmental testing.**

(*Id.* at p. 146, line 21 - p. 147, line 5, emphasis added).

Wallingford also opined that the spring rate of the rollover valve may have to be changed somewhat due to its orientation; i.e., the rollover valve that would be used in the vent line would be a larger valve with heavier components than that which is mounted in the original evaporative emission line.  (*Id.* at 144-45).  However, Wallingford could not state either the actual size or the spring pressure of the valve that should be placed in the vent line.  (*Id.* at 155).

Further, Wallingford admitted that whatever rollover valve is ultimately designed, it would have to pass through a FMVSS 301 test and the vehicle could not be sold without at least passing that

certification test.  (*Id.* at 159, line 24 – p. 160, line 8).[20]

---

[20]     Parenthetically, the court notes that Nissan's design expert, Mark Noble, testified that if the fill vent line is equipped with the rollover valve from the evaporative line (tank vent line), the whole system would not function properly-"border[ing] on not functioning at all" and "if that's what you want to do, you might as well just clamp off the fill vent line."  (Noble Dep. at 50).

     Noble further explained that because the filling process is generally complex, the problem with incorporating the rollover valve from the evaporative line onto the fill vent line is not simply the diameters of the various openings.  (*Id.* at 50-51).  He explained that putting a rollover valve on the fill vent line is not as simple as "supersizing' the rollover valve on the tank vent line:

          the function of the tank vent is to vent the tank when
          the cap is on the vehicle and the vehicle is operating
          down the road,  Of principal interest are going up and
          down mountains where you have big changes in
          atmospheric pressure, and therefore, the tank either
          becomes pressurized or subjected to vacuum.  If you're
          going down a mountain, diurnal effects, temperature
          effects, movement can cause tank pressure and you
          balance how much you want to or can pressurize the
          tank during normal operation with the amount of vapor
          you can let go through this valve up to the canister
          forward, and it's a very delicate balance to achieve
          that.

          ... and the flow rates during those operations are
          very small compared to what the ... the flow rate is
          during fill.  So, you need a much different venting
          type of operation during fill than ... for the tank
          vent.  And that's why one won't work on there [i.e.,
          on the fill vent].
                              . . .
          There's a lot of development.  This is tuned very
          precisely just to accomplish what it does in the tank
          vent, and the fill is also a complicated phenomenon
          and to get proper fill quality, it cannot be achieved
          with this [i.e., the evaporative rollover valve].

(Noble Dep. at 53-54).

     In short, Mr. Noble maintained that the design for a rollover valve for the fill vent line is a "complicated, multi-faceted assignment." (Noble Dep. at 54).

### (2)  At  the  time  the  1993  Pathfinder  left Nissan's  control,  the  GT  Products  Shutoff Valve  did  not  exist  as  an  anti-spill  device for  use  on  the  fuel  filler  tube/neck.

Plaintiffs' expert Green testified that in the 1992-93 time frame, he found no production vehicles that incorporated a GT Products Shutoff Valve or any of its type, and he did not see any production vehicle using a GT valve until the 1998 Saab. (Green Dep. at 83-84).[21]  Further, although Green opines that the technology existed in the 1992-93 time frame to make a GT Products-type valve, he has no evidence that such a valve itself was produced. (Green Dep. at 151).  Indeed, the patent for the GT Products Shutoff Valve is dated January 7, 1997.  (*See* Plaintiffs' Exhibit F).

Plaintiff's expert Wallingford testified that the first time he became aware of any type of GT Products Shutoff Valve that was

---

[21]  As pointed out in Plaintiffs' supplemental opposition, Defendants' design expert (Noble) demonstrated that other production vehicles (including a 1995 Blazer S10, a 1993 Toyota Four Runner, a 1996 Ford Aerostar, a 1993 Mercedes 300E, a 1993 Range Rover, and a 1996 Honda Acura) which were competitive vehicles to the 1993 Nissan Pathfinder, leaked fuel when they were inverted without a fuel cap, like the 1993 Pathfinder did without a fuel cap. (*See* Plaintiffs' Supp. Opp. at pp. 2-4, *citing* Noble's Dep. 89-99; *see also* Green Dep. at 150).

Plaintiffs claim that this demonstration indicates that these vehicles "are in dire need of a check valve/rollover valve in the filler pipe and [fill] vent lines to prevent the leakage rates which were recorded by Mr. Noble." (*See* Plaintiffs' Supp. Opp. at 4).  But Plaintiffs have offered no evidence of any other production vehicle of the 1993 vintage that had a GT Products Shutoff Valve (*or any of its type*) in the filler pipe and a rollover valve in the fill vent line.  (*See* Green Dep. at 150).

economically and technologically feasible was in the late 1990's. (Wallingford Dep. at 175).  And although Wallingford testified regarding two 1987 patents for a "Stant valve," he declined to say that they were representative of the GT Products valve, and he "would have to perform that comparison."  ( *Id.* at 165).[22]   He further agreed that he has not performed research that revealed there was actually a device being produced pursuant to those patents.  (*Id.* at 166-67).

Wallingford admitted that "as far as the patent numbers that I've identified, [not all the valves] mentioned would be readily able to be used **in this application** but the **concept** can be used. And I am of the opinion that valving did exist back in this time period, that had Nissan researched the available valving that they could also have adopted it." (*Id.* at 170, lines 14-24, emphasis added).

And in further testimony, Wallingford testified:

Q.  That's what I'd like for you to identify.  I understand what you said with respect to the concept and your review of the patents.  What I'd like to focus on is what was the available valving that your research, be it in this case or some other, tells you that had we put it in the Pathfinder we would not have had leakage of an amount that you find unacceptable.

---

[22]     Wallingford described GT Products valves and Stant valves as: "Some of them are ball devices, some of them are conical devices.  That's a rectangular cylinder, if you will, or a segmented cylinder.  But the **concept** of being a spring-loaded sealing device is the same for all of them." (Wallingford Dep. at 189, emphasis added).

A.   **I'll have to do that, that was an area probably that I would have-probably have deferred to Mr. Green and obviously it is not something that he has addressed so I will.**

. . .

Q.   We were talking about your opinion of the valves Nissan should have placed in the filler neck, and I had asked you if you could identify for me, during the period of time that this vehicle was being produced, valves by any particular manufacturer that were in production during that period?

A.   And I indicated to you, **I would have to go back and do some additional research to identify those particular valves.**  In particular, I've indicated from the third from the last page vehicles from '83 up to 1993 that anti-spill valves and I'd have to go back and look at those ... to be more specific today.

Q.   To be more specific, is it fair to say, as well, **you don't know that those, if they had been utilized by Nissan would have prevented the flow of fuel out of the filler neck had the cap not been placed?**

A.   **That is correct** and I think you've asked Mr. Green some question about some of the valves and he indicated that his intentions concerning future flow tests.

(*Id.* at 170-71, emphasis added).[23]

---

[23]   When Wallingford was asked did he believe (based on those patents identified in his report) that there were in the automotive check valve community available devices as shown in these patents as early as 1957, Wallingford replied:

> Some of these patents talk about different types of designs in the check valve community.  Some of them are ball valves.  Some of them are designed in smaller flow capacities.  But the point being the patents identify **concepts** when examined by the reader will

With respect to the filler tube itself, Wallingford was asked if he could provide counsel with any details other than he would like to see a Stant type valve in the filler neck.  He replied:

A.   No, I didn't say, I'd like to see, I indicated to you that is a type of valve that could have been researched by Nissan and been installed and had prevented the loss of fuel from the filler pipe.

Q.   Assuming its availability at that time?

A.   Yes.   Or-the **concept** was developed at that particular point in time.  And I indicated again that there are at least three vehicles, five vehicles excuse me, that have been identified as vehicles that had anti-spill devices installed inside the fuel tank.

Q.   I thought I understood you to say **you had no opinion with respect to what the flow rates would have been for those valves?**

A.   **Correct.**

Q.   So the fact that they have had one, they may have had one, it may not have worked.

A.   That is correct.

Q.   But if it didn't work, you'd be critical of it?

---

help to understand the fact that these are viable **concepts** with **additional work** that can be developed. **It's important to understand that they are typically not developed unless there is a market for them.  They stay as a patent.  Unless somebody buys my idea, I'm not gonna spend a bunch of money manufacturing – designing, developing and manufacturing a number of them and not have anyone to buy them.  So the patents are driven by a need.**

(Wallingford Dep. at 190, emphasis added).

A.   That is correct.  But it is a function, as you've already gleaned from Mr. Green's deposition,  as to the selection of the sealing material as to whether it leaks or doesn't leak or the spring rate of the device as to whether it leaks or doesn't leak.

Q.   Can you with respect to sealing material or spring rate, provide me with **any specifics** of what should be included, in your mind, in the Pathfinder fill tube, or are we sort of back in the same place we were with what should be provided in the vent tube?

A.   We are back to the same place.

Q.   No details from that other than you would tell me a valve of this type?

A.   **That's correct.  I cannot sit here today and tell you and the ladies and gentlemen of the jury that I have developed a production level system to put into the 1993 Nissan Pathfinder.  That's not the case.**

(*Id.* at p. 175, line 22 - p.  177, line 19, emphasis added).

In his report, Wallingford states that "anti spill valves are installed inside the fuel tank on" the following vehicles:  1983 Toyota Cressida four door wagon; 1983 Volkswagon Jetta, 1987 Honda CRX; 1991 Lexus ES250, 1993 Geo Tracker, 1995 Geo Tracker, 1997 BMW 528i, 1999 Pontiac Grand AM, 2000 Chevrolet Cavalier, 2003 Chevrolet Impala, 2003 Chevrolet Malibu, and 2003 Buick Regal. (Wallingford Report, pp. 19-20).  But there is no evidence showing that any of the "anti spill valves" in those vehicles *manufactured*

25

*in or before 1993* were the GT Product Shutoff Valve.[24]

Further, in his deposition, Wallingford admitted that he did not undertake on any of those vehicles any analysis to determine if the anti-spill valves actually stop the flow of fuel if the cap is missing and the vehicle is inverted.   (Wallingford Dep. at 137-38).   And he has no opinions or factual testimony that he can share as to details of what the leakage rate would be for any of the vehicles if he performed the same type of analysis as Mr. Green

---

[24]   To the contrary, a comparison of the vehicles (Wallingford listed on pp. 19-20 of his report) to the vehicles actually tested by Green (and listed in Green's report, Appendix F), shows that the 1993 Geo Tracker had a "caged ping-pong type valve" that Green modified with a neoprene ball for testing purposes and the 1983 Toyota Cressida had a "stock flapper valve" that Green modified by adding a layer of Viton. (*See* Green's Report, Appendix F, "Fuel Tank Testing Leakage Rates"; *see also* Green Dep. at 69-87).

Further, the only two vehicles listed on Green's Appendix F that had a "GT Products spring loaded check valve" were the **2000** Chevrolet Malibu and the **1998** Saab 900, neither of which are contained in Wallingford's listing and both of which were manufactured years after the 1993 Pathfinder in question.

The court also notes that in Appendix C of his report, Green lists the vehicles he "looked at for [determining] whether or not they contain check valves." (*See* Green's Report, Appendix C, "Index of Vehicle Fuel Tanks;" *see also* Green Dep. at 74-75).  The following vehicles listed by Wallingford on pp. 19-20 of his report are also contained on Green's Appendix C:  the 1983 Toyota Cressida; the 1983 VW Jetta; the 1987 Honda CRX; the 1991 Lexus ES250; and the 1993 Geo Tracker.  While Wallingford did <u>not</u> test these vehicles (or any other vehicle) for leakage, Green tested these vehicles and found that while these vehicles had some type of fuel filler neck check valve, there was still unacceptable fuel leakage as these vehicles existed from the manufacturer.

In discussing the vehicles listed on Appendixes C and F of his report, Green admitted that of all the vehicles he tested, it was not until the 1998 Saab did he see a vehicle that was mass produced containing a GT Products valve. (Green Dep. at 83-84).  Further, Green admitted that for production vehicles, the only filler neck check valve that he tested and found to be acceptable was the GT Products Shutoff valve. (*Id*. at 87). And that in the 1992-93 time frame, he found no production vehicles that incorporated such a GT Products Shutoff Valve or that type of valve. (*Id*. at 150).

did with the subject Pathfinder. (*Id*. at 138). Further, Wallingford has not taken any of those anti-spill valves which he has identified and inserted them into a 1993 Pathfinder to determine if they would prohibit the flow of vapor and fuel. (*Id*. at 174). As mentioned earlier, Wallingford did <u>no</u> testing but relied on Green's testing.

Plaintiffs nevertheless argue that:

> With regard to the GT Products shutoff valve (Exhibit F), Nissan has raised an issue of feasibility. Looking at the face of the patent itself,[25] it is evident the device consists of a housing, a spring and a sealing member. The working parts in the GT Products Shutoff Valve (Exhibit F) and the manner in which the working parts prohibit or retard the flow of fuel, is substantially similar in principle to the way the Nissan Rollover Valve (Exhibit E) functions.

(Plaintiffs' Opp. at 13).

In support of this argument, Plaintiffs cite the Affidavit of its expert, Jerry Wallingford, attached as Exhibit D to Plaintiffs' opposition. However, the court finds that Plaintiffs read more into Wallingford's Affidavit than they should. What Wallingford said in his Affidavit pertaining to the GT Product Shut-off Valve was the following:

> The technology utilized in both the GT products valve and the Aero Tech safety valve [used on racing cars] is basic in design.

---

[25]     Again, the patent for the GT Products Shutoff Valve is dated January 7, 1997, four years after the Pathfinder in this case was manufactured. (*See* Plaintiffs' Exhibit F).

27

> Essentially each of these rollover/safety
> valves incorporates a sealing member, which
> allows fuel to flow through the fuel filler
> line into the fuel tank in one direction but
> does not allow the escape of fuel through the
> fuel filler line and fuel filler vent line in
> the opposite direction in the event the
> vehicle is inverted and the filler cap is left
> off or compromised or the top of the filler
> tube is cracked or broken. Based on a
> reasonable degree of engineering certainty,
> these safer alternative designs could have
> feasibly been incorporated into the subject
> 1993 Nissan Pathfinder at the time it was
> manufactured.[26]

(*See* Wallingford Affidavit, attached as Plaintiffs' Exhibit D, p. 7 of 8).

While the GT Product Shutoff Valve and Nissan rollover valve (which was equipped on the 1993 Pathfinder evaporative/tank vent) may both work through a sealing member, Plaintiffs have offered insufficient evidence to show that they are substantially similar or that the GT Product Shutoff Valve (patented in 1997) could have feasibly been incorporated into the subject 1993 Nissan Pathfinder at the time it was manufactured.[27]

Plaintiffs further maintain that they do not have the burden of "rebuilding a production model '93 Pathfinder with the safer

---

[26] As the court already discussed, Plaintiffs' counsel conceded at oral argument that Plaintiffs were not offering the racing car alternative as a safer alternative design. (*See* pp. 14-15, *supra*).

[27] Defendant's expert Noble explained that around 1998, "you started to have valves like the GT Products valve. Their function is for ... evaporative emissions and for onboard vapor recovery and fill quality. **They're not meant to seal the filler when the vehicle is inverted, and they in fact often don't.**" (Noble Dep. at 59, emphasis added).

fuel system developed by Green" and that "[m]odifying [the Nissan rollover valve that Nissan did in fact use on the evaporative line of the 1993 Pathfinder] to a larger line, such as the vent line or the filler tube, is feasible as illustrated in Green's testing (Exhibit G, tab 3, tab 4), *See also* Affidavit of Wallingford at p. 6." (Plaintiffs' Opp. at 15-16).

However, with regard to the incorporation of the GT Products Shutoff Valve on the Pathfinder tank, the summary judgment evidence reflects that it would not be as easy as Plaintiffs suggest. Plaintiffs' expert Green would not recommend installing a GT Product Shutoff Valve in the same location as that valve is installed on the Malibu tank, but rather he would put it closer to the spud on the exterior of the tank.  (Green Dep. at 123). Otherwise, filling the tank to its maximum of 21.1 gallon would cause a column of fluid upstream of the valve on the filler neck side of the valve, and if the filler cap was removed, several ounces of fluid would leak out.  (Green Dep. at 123).

Green further testified:

Q.   When you talked about the complete GT product system, you're talking about as used in the Malibu, including whatever is used with respect to the vent tube?

A.   Correct.

Q.   Again, you haven't attempted to adapt the Pathfinder system with the entirety of the GT product system as we sit here today?

A.   Really, it is us swapping out one tank for the
     other, and we're talking about fuel tanks, and the
     size of the Malibu fuel tank, the size and shape of
     it is, of course, going to be different than the
     pathfinder tank.  It goes in a different location.

Q.   So–

A.   So they're not the same size or the same shape, but
     essentially it would just be taking one tank and
     adapting those parts to a different tank, but I
     have not tried to take all those parts off the
     Malibu tank and install them on the –Pathfinder
     tank.  Could it be done?  Yes.

Q.   In the sense of taking the Malibu tank as
     configured and using it as a Pathfinder, the tank
     shape is different and you wouldn't be able to make
     that swap?

A.   **It would not be an easy one for one swap.**

Q.   ...at least of this date, that type of set up has
     not been done or tested?

A.   Right.

Q.   –on a Pathfinder tank?  That's correct.

(Green Dep. at 155-56, emphasis added).

For other systems Green has seen that utilized the GT filler

check valve, there is also a vent tube that runs up to the filler

neck area and it has a valve with an orifice larger than the valve

that is in the 1993 Pathfinder evaporative vent line.  (Green Dep.

at 125, lines 21-25).  But he has not attempted to utilize one of

those larger valves with the Pathfinder as part of his testing,

because the valves that are on the GT product system are actually

internal to the tank, so "we would have had to cut another hole and

30

try to affix this valve with a seal internal to the tank.  It's not an external valve like the Nissan valve is." (*Id*. at p. 126, lines 3-11).  On these other GT Products systems, the vent tube leaves the tank on the top surface of the tank in a different area from where the filler neck joins and it goes up to the filler neck. (*Id*. at p. 126, lines 15-24).

Green also admitted that if the alternative design using the GT Products Shutoff Valve was to be put in a production vehicle, the valve would have to be mounted on the top of the tank with a vent line equipped with an appropriate rollover valve installed in the tank so that the tank could be filled to capacity. (Green Dep. at 159).  However, no such configuration was done.  (*Id*).

Green also did not have the GT Products Valve specs, i.e., what was set out by the designers of the valve to do. ( *Id*. at 160).  And he made no study  with respect to the technological feasibility and ability to mass produce the GT Products valves. (*Id*. at 161).

Based on the foregoing discussion of both the rollover valve and the GT Products Shutoff valve, the court concludes that Plaintiffs' Alternative Design 2 (the GT Products Shutoff Valve/Nissan Rollover valve) was "merely a concept" presented by Plaintiff' experts, and that Plaintiffs have presented no genuine issue of material fact at this summary judgment stage to show that

the alternative design was *in existence* at the time the vehicle left Nissan's hands. LPLA, 9:2800.56(1); *Seither v. Winnebago Industries, Inc.*, 853 So.2d 37, 41 (La.App. 4th Cir. 2003).

### (3)  *Have Plaintiffs presented sufficient evidence to enable a reasonable trier of fact to conclude that Plaintiffs have established that the risk avoided by their purported safer designs outweighed the burden of adopting such designs?  "No"*

Plaintiffs' burden of proof requires them "to show not only that there was an alternative, safer design, but also that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utility)." *Laverspere*, 910 F.2d at 181. As the court next discuses, *even if* Plaintiffs had offered sufficient evidence to survive summary judgment on the "in existence" requirement of LPLA 2800.56(1), Plaintiffs have woefully failed to offer sufficient evidence to survive summary judgment to satisfy this "risk-utility" requirement of the LPLA 2800.56(2).

Plaintiff's expert Wallingford testified that even though he believes fuel caps are left off on a regular basis he does not believe there is a "percentage incident of fire" as related to fuel caps not being in place because the vehicles do not have two coincidental events occurring, that being the cap not being

installed and the vehicle being inverted in an accident. (Wallingford Dep. at p. 118, lines 11-24).

Plaintiffs' experts performed neither studies of incidences of rollovers with a 1993 era Pathfinder resulting in fires nor any analysis with respect to incidences of fire in vehicles involved in accidents where there is a filler neck check valve versus where there is no filler neck check valve.[28]  (Green Dep. at 149, 177). Contrast Garcia v. Brown , 889 So.2d 359, 362 (La.App. 2nd Cir. 2004)(plaintiff introduced evidence concerning the extent of the risk that the alternative design would have avoided, the frequency of accidents like his own, and the economic costs entailed by those accidents).

Further, Plaintiffs' expert, Green, testified:

Q.   And it's fair to say that having found no filler check valves in production at that time frame, you wouldn't have a comment that there were some from that time frame, other than the racing valve, that would have an effect on the potential fire in this case.  Is that fair?

A.   Yes.

(Green Dep. at 158, lines 6-12).

Q.   With respect to modification no. 2 [GT valve and Nissan rollover combination] can you say with a reasonable degree of scientific certainty, that modification could be made to a production level 1993 Pathfinder and not affect the performance of

---

[28]    Further, Plaintiffs' expert Green has no knowledge of any other Pathfinder rollovers of the 1993 time frame involving a fire.  (Green Dep. at 150).

that vehicle and ultimately prevent the fire that occurred in this case?

A.   Yes, to the first part of your question and I don't know to the second part, but it certainly would have reduced the fuel leakage that occurred in this accident.

Q.   And yes to the first part of my question was yes to what?

A.   That you could modify this-the GT Product system to a 1993 Pathfinder.

Q.   [But] again this is a statement back to the entirety of the system modification not the modification that you did?

A.   Correct.

Q.   Okay. Because the modification you did because of the vent tube, at least there is a concern with whether there would be a filling issue.

A.   Correct.

(Green Dep. at 168, line 20 - p. 169, line 18).

Plaintiffs have also offered little, if any, evidence concerning the burden of switching to Alternative Design 2. There is nothing in any document submitted by the parties that is an indication "of the costs that the manufacturer would have incurred had it used the alternative design."[29] *Lavespere*, 910 F.2d at 183.

---

[29]   When Plaintiffs' counsel attempted to get Nissan's corporate representative Sasaki to agree that a rollover valve on the fill vent line would cost about $3.00 and a check valve on the filler tube would cost about $6.00, Mr. Sasaki replied that he does not do "cost estimation" and he also testified that there are many "very difficult, highly technical problems" that would prevent Nissan from putting a rollover valve on the fill vent line and a check valve on the filler tube. (Sasaki Dep. 112-16). Further, even if a rollover valve or check valve may be in and of themselves relatively inexpensive (i.e., $3.00-6.00 as suggested by Plaintiffs' counsel), there is

Finally and most significantly, Plaintiffs have completely failed to address the adverse effect of their purported safer design (i.e., Alternative Design 2: the GT Product Shutoff Valve/Nissan rollover valve combination) on the utility of the Pathfinder.[30]  Indeed, as the court discusses next, the testing and testimony of Plaintiffs' expert Green illustrate the negative effects of Alternative Design 2 on the Pathfinder's utility.

It is important to note that Green's testing of Alternative Design 2 was not performed on an actual vehicle in a commercial filling setting.  Green admitted that he did not take a vehicle with the "GT Products valve/Nissan rollover valve" configuration to a commercial pump to try to fill the tank.  Green explained that because the inside orifice of the rollover valve (on the evaporative line) is less than the inside diameter of the fill vent line, the tank he configured by placing that rollover valve on the

---

no evidence to show how much it would cost Nissan to actually implement such valves in a fuel system that would actually work in a safe and reasonable manner.

[30]    While Plaintiffs' counsel conceded that Plaintiffs were not offering the Alternative Design 1 (using the racing car valve) as a safer alternative design, the court notes that Plaintiffs also failed to perform the **"utility side" of risk-utility test** on Alternative Design 1. Plaintiffs' expert Green never took his test apparatus to a commercial gas station to test the fillability, and instead used a gas can to fill the modified tank.  (Green Dep. at 116).  Further, Green could only put in 10 gallons because of the way he had to mount the racing valve on the Nissan tank as designed.  (*Id.* at 108-09).

        Defendant's expert Noble could not even mount the racing valve on a 1993 Pathfinder.  (Noble Dep. at 122-23).  Rather, for fill testing purposes at a commercial filling station, Noble had to put the Pathfinder tank (as modified with the racing valve) inside the bed of a pick-up truck.  (*See* video testing by Noble).

"stepped-down" fill vent line would not allow the vehicle to be filled at a commercial filling station. (*Id.* at 119, 124-25). And while Green testified that "so [we simply] need to have a larger-larger valve and a larger orifice," (*Id*)., it is undisputed that Green never made a configuration using a larger valve.

Instead of testing his alternative design on an actual Pathfinder at a commercial filling station, Green used a gas can to fill the modified tank which he mounted on a rotating fixture. Further, because of the way the metal fill neck was designed for the Malibu, the GT Products Shutoff Valve extended into the Pathfinder tank "quite a ways" such that the tank (which had the capacity to hold 21.1 gallons) was only able to hold 15 gallons of fluid because filling the tank with any more solvent would have caused a column of fluid upstream and leakage when the filler cap was removed. (*Id.* at 121-23). Green further explained that "if we are going to put a GT Product style valve in this tank, I wouldn't recommend putting it in as far as it was on the Malibu tank. It should go closer to the spud on the exterior of the tank." (*Id.* at 122-23).

On the other hand, Nissan's expert in fuel system design (Mark Noble) actually tested the utility of Plaintiffs' alternative (GT Product valve/unmodified Nissan rollover valve) design. Noble mounted the alternative design in a 1993 Pathfinder, and then took it to a commercial filling station for filling purposes (as would

36

the buying public).   At the filling station, it took "a considerable amount of time [approximately 10 minutes with] over 200 shutoffs" to add 10.3 gallons to the modified tank.  (Noble Dep. at 120).   Further, as evident from the video of Noble's testing at the commercial filling station, the filler tube leaked unacceptable levels of gasoline due to spit-back.[31]  Noble's testing is uncontradicted at this summary-judgment stage.

In contrast, it took only about three minutes to fill an exemplar 1993 Pathfinder with approximately 20 gallons of fuel, with no fuel leakage.  (*Id*. at 118).  There were no shutoffs in the filling process, until the end when it shut off when the tank was filled.  Again, Noble's testing is uncontradicted at this summary-judgment stage.

Plaintiffs attempt to satisfy the utility test by pointing out that when Nissan's expert (Mark Noble) tested this alternative design, Mr. Noble was able to drive the vehicle after filling the tank (again with 10 gallons of gasoline).  But "this is not sufficient to carry the day." *Lavespere*, 910 F.2d at 183.  As the court next discusses, in the context of this case, there is more to "utility" than whether or not a vehicle can be driven.

First, Mr. Noble testified that he only drove the vehicle "[a]

---

[31]    Both Plaintiffs and Nissan have cited portions of Noble's deposition in their respective briefs, and Plaintiffs attached excerpts from Noble's deposition to their supplemental memorandum.  For the sake of completeness, the court has ordered that a full copy of Noble's deposition be filed into the record, along with copies of Noble' video testing.

mile or two" at about "30 miles an hour."   (Noble Dep. at 124).
Second, notwithstanding the fact that Mr. Noble drove the vehicle
after filling, Plaintiffs have completely failed to address the
negative effects (including the inability to fill the tank at a
commercial filling station in a reasonable amount of time,[32] the
inability to fill the tank to its full capacity, and fuel spit-back
during filling) that Plaintiffs' Alternative Design 2 had on the
utility of the Pathfinder.

Based on these *unaddressed* negative effects, the court
concludes that Plaintiffs have shown <u>no</u> evidence that Plaintiffs'
Alternative Design 2 (which prevented fuel leakage when tested in
a non-vehicle set-up) would have also allowed the 1993 Pathfinder,
as a production vehicle, to be filled safely and properly, i.e., to
safely function on a daily basis. There is also no evidence
concerning the nature and extent of the economic problems likely
generated by rendering the filling operation unsafe.

"Under the circumstances, [the court has] little difficulty
concluding that [Plaintiffs'] evidence was insufficient to defeat
[Nissan's] motion for summary judgment.  [Plaintiffs] proof of the
risk that might have been avoided by the alternative design and of
the burden that switching to that design would have entailed was,
to say the least, incomplete.  Faced with this meagre evidence, no

---

[32]    Again, it is uncontradicted by summary judgment evidence, that
after some 10 minutes, with over 200 shut-offs, Noble's attempt to fill the 21
gallon tank was abandoned. (*See* video testing attached to Noble's deposition).

reasonable trier of fact could have concluded that the balance of those two factors tipped in favor of the risk avoided.  One cannot balance items of indeterminate weight."  *Lavespere*, 910 F.2d at 183.[33]

## B.  Plaintiffs' Other Claims

At oral argument on Nissan's Motion for Summary Judgment, the following colloquy was exchanged between the court and Plaintiffs' counsel:

---

[33]     As in *Lavespere,* the court notes:

In arriving at this result, [the court does] not mean to suggest that the plaintiff must, in every case, introduce evidence that details and quantifies the risk avoided and the burden incurred in order to prevail under the defective design theory of the LPLA. As courts in other jurisdictions that have placed on plaintiffs the burden of proof on the risk-utility issue have suggested, there may be cases in which the judge or jury, by relying on background knowledge and "common sense," can "fill in the gaps" in the plaintiff's case, estimating the extent of the risk avoided, the costs of implementing the proposed design change, or the adverse effects of the design modification on the utility of the [product].  For this to be possible, however, the product itself, must be relatively uncomplicated, and the implications of the change in design must be such that a layman could readily grasp them.  That clearly is not the case here.

*Lavespere*, 910 F.2d at 184.

     *See also Gaylord*, 30 F.3d at 590-91 (applying LPLA,9:2800.56 and holding that opinion by plaintiff's expert that alternative design would have been "'obvious[ly]' inexpensive and easily implemented" was insufficient to withstand manufacturer's motion for summary judgment in absence of other evidence on alternative design's feasibility and utility effects, and expert's modifications left unanswered questions of engineering and design that were of sufficient complexity to go beyond the expertise of the average judge and juror).

Court:     Am I correct that this is a design defect
           lawsuit?

A.         Your Honor, Brantley White for the plaintiffs.
           In essence, you're correct, Your Honor.

Court:     Well, you say "in essence." Is that correct?
           In other words, let me ask it another way.
           This is not a **failure to warn** case, is that
           correct?

A.         We have alleged failure to warn, Your Honor.

Court:     I am asking you today, as an officer of the
           Court, what are you going to show on a failure
           to warn?

A.         We are going to show that defendant Nissan
           failed to warn of the dangers inherent in this
           vehicle if the filler cap was left off,
           compromised, or if the filler neck became
           compromised.

Court:     In other words, your argument is that the
           instruction manual or the Owner's Manual that
           came with the vehicle, that the warnings
           therein were inadequate?

A.         I do not believe, Your Honor.  And I believe
           the instructions are clear and they do not
           bring home the danger of what might occur if
           the filler cap is left off or compromised.

Court:     Do you have any expert that is going to
           address that issue?

A.         Mr. Wallingford.

Court:     He hasn't addressed that in his report or any
           of his affidavits, has he?

A.         I believe he simply said that there's
           inadequacy and absence of any warning that
           brings home that danger to the ultimate user.[34]

---

[34]     As discussed later in the text of this opinion, the court finds
that there is no such testimony from Wallingford.  (*See* p. 42, *infra*).

40

Court:      Is it your position that the design defect
            that's involved in this lawsuit involves the
            design of the vehicle and its fuel system in
            general and not in particular the design of
            the fuel filler cap?

A.          Yes, in part, Your Honor.  However, we would,
            and we do, allege that the defendant Nissan
            could have and should have incorporated a
            **tether** to the filler cap which would have made
            sure that the filler cap always went with the
            vehicle.

Court:      Is it your position that tethers to filler
            caps were in use in 1993?

A.          I believe that's undisputed, Your Honor.

Court:      Would there be an expert and, if so, from whom
            that will say that the absence of a tether on
            the fuel cap rendered the fuel cap defective?

A.          There will be testimony from experts,
            including Mr. Wallingford, who will opine that
            the incorporation of a tether mitigates
            against the possibility of forgetting to
            replace the fuel cap.[35]  In other words, Your

---

[35]     In accordance with this statement by counsel, Wallingford
testified:

Q.   With respect to your own experience, have you developed any
     evidence to support the proposition that if a tether is in
     place, the fuel filler cap will, in fact, be regularly
     placed in its position more commonly than those that are not
     tethered?  In other word, is there anything about this
     tether that makes one put the filler cap in place?

A.   Yes.  Again, Mr. Sasaki addresses that with a tether.  When
     I go to close the door, it interferes with the door, hangs
     out below the door.  Therefore, giving the person that's
     finishing the refueling operation as an indication that I
     need to take another action, I have forgotten something.
     depending upon the length of the tether, on some occasions,
     it will not allow the fuel filler door to close fully.

(Wallingford Dep. at 115).

     The court notes that although the subject 1993 Nissan Pathfinder
did not have a tethered fuel cap, the filler door was equipped with a built-in

> Honor, if the evidence, if the jury believes that there is an absence of a fuel cap despite Leonard Thompson's testimony that he replaced the filler cap, then we would want them to consider ... the evidence with regard to a tether.

(TR. of Oral Argument on March 16, 2006, pp. 3-5, emphasis added).

As the court next discusses, Plaintiffs cannot survive summary judgment on either their claim of an inadequate warning or their claim related to the absence of a tether.

### (1)  Inadequate Warning Claim

Plaintiffs have presented no evidence, from either of its experts Wallingford or Green, of an inadequate warning, nor do they present any language of a proposed adequate warning.  When asked if he had a criticism of Nissan with respect to instructions or warnings that it may have given with respect to utilization of the fill cap, Wallingford replied:  "I don't believe I'm addressing any warnings, issues, so I don't believe I have any comments about the lack of warnings." (Wallingford Dep. at p. 191, line 25 to p. 192, line 5).

Green testified that he has no opinion with respect to information contained in Nissan's Owner's Manual as related to fuel filling and use of the fuel filler cap.  (Green Dep. at p. 43, lines 5-8).  And he has not reached any opinions with respect to

---

shelf holder which was designed to be used for placement of the gas cap during refueling.  (*See* Owner's Manual, attached as Exhibit C to Nissan's Motion for Summary Judgment).

warnings, instructions or anything of that nature in this case. (*Id*. at p. 43, lines 9-13 & p. 64, lines 7-11).

### (2)   Absence of a Tether Claim

To the extent that Plaintiffs are claiming that the lack of a tether on the fuel cap is a design defect, the court finds such a claim is at least inconsistent with Plaintiff Leonard Thompson's testimony in his affidavit that he screwed the fuel cap back on after he filled the tank prior to the accident.[36]   More significantly (and fatal to Plaintiffs at this summary judgment stage), Plaintiffs have no evidence to support that the lack of a tether was a defective design.

Plaintiff's expert Wallingford testified that he has done no research or study in the utilization of tethers on fuel filler caps, except to acknowledge that Nissan's corporate representative (Sasaki) indicated that the cap was not tethered in this case. (Wallingford Dep. at p. 114).  Wallingford also agreed that because a tether does not insure that a fill cap is actually tightened and in place, even with a tether the vehicle would not be reasonably safe.  (*Id*. at p. 201, lines 8-21).

---

[36]   As the court previously stated in the "Background" section of this opinion, Leonard Thompson testified in his deposition, that he was the last person to fill the vehicle with gas prior to the accident and that he had "closed the thing back up." (Thompson Dep. at 58).  In a subsequent Affidavit, Mr. Thompson clarified "that what he meant by 'closing the thing back up,' was that I screwed the gas cap back on the vehicle, until it was secure, and then shut the filler door." (*See* Thompson Affidavit attached as Exhibit A-1 to Plaintiffs' Opp.).

43

Wallingford also has not done any sort of statistical analysis with respect to incidences of fuel caps not being in place. (*Id*. at p. 117, line 23 through p. 188, line 1).  And he is not aware of any type analysis where the National Highway Traffic Safety Administration (NHTSA) or anyone else has reported that to the automotive community. (*Id*. at p. 118, lines 2-5).  With no evidence of any analysis regarding incidences of fuel caps not being in place, there can no basis to argue that a lack of a tether in any statistically significant way increases the incidences of failures to replace a fuel cap.

Finally, as the court previously stated, even though Wallingford believes fuel caps are left off on a regular basis he does not believe there is a "percentage incident of fire" as related to fuel caps not being in place because the vehicles do not have two coincidental events occurring, that being the cap not being installed and the vehicle being inverted in an accident. (See pp. 32-33 of this Opinion, *citing* Wallingford Dep. at 118, lines 11-24).

### III.   Conclusion

Based on the foregoing,

**IT IS ORDERED** that Nissan's **Motion for Summary Judgment (Doc. No. 80)** be and is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that all of Plaintiffs' claims be and are hereby **DISMISSED;**

**IT IS FURTHER ORDERED** that the following motions be and are hereby **DISMISSED AS MOOT:** Plaintiffs' **"Motion in Limine"** (Doc. No. 76); Nissan's **"Motion in Limine to Exclude Expert testimony of Cornelius Gorman"** (Doc. No. 79); Nissan's **"Motion in Limine Regarding Introduction of Patents"** (Doc. No. 82); and Nissan's **"Motion in Limine to Limit Testing Regarding Dislodged Filler Caps"** (Doc. No. 83).

New Orleans, Louisiana, this **20th** day of **April**, **2006.**

 

 

A.J. McNAMARA
UNITED STATES DISTRICT JUDGE